#28126-aff in pt & rev in pt-SRJ
**2018 S.D. 61**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

  v.

DAVID LEONARD RANDLE, JR.,                Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BRADLEY G. ZELL
Judge

* * * *

AUSTIN J. VOS
MARK KADI of
Minnehaha County Office of the
   Public Advocate                        Attorneys for defendant and
Sioux Falls, South Dakota                 appellant.


MARTY J. JACKLEY
Attorney General

JOHN M. STROHMAN
Assistant Attorney General                Attorneys for plaintiff and
Pierre, South Dakota                      appellee.

* * * *

CONSIDERED ON BRIEFS
MAY 21, 2018
OPINION FILED **08/01/18**

#28126

JENSEN, Justice

[¶1.]         David Leonard Randle, Jr. appeals his convictions for first-degree manslaughter, unauthorized ingestion of a controlled substance, and possession of two ounces or less of marijuana.  Randle asserts the circuit court erred in denying two motions for mistrial and rejecting a proposed jury instruction on first-degree manslaughter.  We affirm in part, reverse in part, and remand for a new trial.

## Background

[¶2.]         On October 24, 2015, a group of young adults attended a party at a Sioux Falls condominium leased by Mason Mitzel.  There was evidence that the partygoers were drinking and using marijuana and other illegal substances.

[¶3.]         At some point during the evening, an AK-47 owned by Mitzel was brought out amongst the partygoers.  There was testimony that different individuals handled the AK-47.  Several witnesses stated that Randle began handling the AK-47 and that Randle had the gun sitting on his lap for an extended time.  More than one person stated Randle was "playing" with the gun and at times, pointed it in different directions as others sat in the room.  Several witnesses recognized that the clip was in the gun and testified that they were nervous with how Randle was handling the AK-47.  Witnesses testified that several people in the room asked Randle to put the gun away, but Randle stated he could handle it.  Witnesses also testified that at one point, Mitzel took the gun from Randle, but that Randle picked up the AK-47 again and continued handling it.

[¶4.]         While Randle was sitting in the living room next to his friend Mikael Ashame the gun discharged.  Three witnesses, who were in the living room when

-1-

the AK-47 fired, testified that Randle had the gun when it discharged. These witnesses testified that they did not believe Mitzel was in the living room when the gun discharged. The bullet struck Ashame, traveled through his left hand and right forearm, and penetrated the femoral artery in his groin.

[¶5.] The jury heard Randle's version of the shooting from a recorded phone call with his girlfriend made while he was in custody at the Minnehaha County Jail. During the call, Randle told his girlfriend that Mitzel put the gun on his lap and that Randle's chair, which had rollers, began to slide backward. As the chair slid back, Randle claimed the gun began to slide off his lap. Randle stated that he grabbed the gun to prevent it from falling and that the gun discharged. Randle claimed that after the gun went off, Ashame looked at him and said, "You shot me," then went limp.

[¶6.] The partygoers immediately reacted to the gunshot. Mitzel, who was under suspicion for drug dealing, stuffed black duffel bags full of narcotics and other contraband, threw them in the trunk of his car, and fled the scene. Randle and another friend Desmond Henderson attempted to carry Ashame to a vehicle in the driveway to take him to the emergency room. The pair placed Ashame on the lawn and attempted to start the nearest vehicle. The vehicle would not start because of a dead battery, so they brought Ashame back into Mitzel's home.

[¶7.] The remaining partygoers hurriedly placed the AK-47 and another gun in the back of a van and left the scene. Henderson and Randle continued to attend to Ashame. Randle applied pressure to Ashame's wound and told Henderson to call 911. Several minutes later, law enforcement arrived and found Randle still tending

to Ashame's wound. The wound had stopped bleeding, but law enforcement immediately requested emergency medical personnel. Ashame was taken by ambulance to Sanford Hospital where he was pronounced dead. Minnehaha County Coroner Dr. Kenneth Snell stated Ashame's cause of death was a gunshot wound to the femoral region.

[¶8.] Back at Mitzel's residence, police officers began to investigate the incident. Officers observed marijuana shake and drug paraphernalia in the family room, a trail of blood leading outside the home, and a pool of blood in the grass. They found a blue bag on the front porch that was full of narcotics and contraband, and an empty shell casing on the family room floor. The officers interviewed Randle, who told them a masked intruder had broken into Mitzel's home to steal money. Randle claimed the burglar accidently shot Ashame and fled the residence.

[¶9.] Meanwhile, the partygoers who had left the scene began to call Sanford Hospital to ask about Ashame's condition. Law enforcement followed up on these calls and obtained the statements of several of the individuals. Police ascertained that there was no attempted burglary and that Randle had been holding the AK-47 when it fired. They also learned that a group had left the party in a van and had discarded the AK-47 in a wooded area behind a Sioux Falls trailer park. The group had also disposed of their bloody clothes, narcotics, and drug paraphernalia. Police recovered the discarded items.

[¶10.] Police arrested Randle, secured a search warrant, and collected his DNA and a urinalysis (UA). Randle's UA revealed he had carboxyl, THC, benzoylecgonine, MDMA, and codeine in his system at the time of the incident.

Randle was charged with first-degree manslaughter, second-degree manslaughter, unauthorized ingestion of a controlled substance, and possession of two ounces or less of marijuana. A trial was held September 12-16, 2016.

[¶11.] At the start of trial, the circuit court ordered that the witnesses be sequestered per SDCL 19-19-615. The State subpoenaed Abbygail Thomas to testify on the first day of trial. Thomas arrived at the courthouse early and sat in the courtroom during the testimony of one police officer. After learning that Thomas had been in the courtroom before testifying, Randle's trial counsel moved for a mistrial. After a brief hearing, the circuit court held that a violation of the sequestration order had occurred but denied the motion. Thomas later testified.

[¶12.] During the direct examination of Detective Timothy Bakke, the prosecutor asked whether Randle had requested to consult counsel during an interview after the incident. Randle's counsel objected to the question before any answer was given. Following a bench conference, the prosecutor moved on to a different topic and the question was never answered. Randle's counsel moved for a mistrial. The circuit court denied the motion.

[¶13.] Randle proposed a jury instruction for excusable homicide for the first-degree manslaughter charge. The instruction was designed to support Randle's theory of defense that Ashame's death was accidental. The circuit court rejected the proposed instruction.

[¶14.] Randle was convicted by the jury on all counts. He appeals those convictions asserting the following issues for our review:

1. Whether the circuit court erred by denying Randle's motion for mistrial after a state witness violated the court's sequestration order.

2. Whether the circuit court erred by denying Randle's motion for mistrial after the prosecutor asked a police officer whether Randle had invoked his right to counsel during an interview with the officer.

3. Whether the circuit court erred by rejecting Randle's proposed jury instruction on excusable homicide.

4. Whether the cumulative effect of the circuit court's alleged errors entitle Randle to a new trial.

## Analysis

*1. Whether the circuit court erred by denying Randle's motion for mistrial after a state witness violated the court's sequestration order.*

[¶15.] During the hearing on Randle's motion for a mistrial for violation of the sequestration order, Thomas admitted that the State had informed her she could not enter the courtroom before she testified but that she had forgotten. Thomas testified that she did not hear the opening statements of either party and that she only heard the testimony of an officer named Jeff (Officer Gillespie). Thomas stated that she had not spoken to anyone outside the courtroom or any other potential witnesses that morning. Randle's trial counsel asked Thomas whether she was going to change her testimony based on anything she heard in the courtroom. Thomas responded, "No sir." The court reemphasized the sequestration order before excusing Thomas.

[¶16.] Officer Gillespie's testimony consisted of his observations of the crime scene immediately after the shooting, and his recollection of statements made by Randle and Henderson. He testified as to Randle's initial account that a burglary

had occurred and his observations that Randle was under the influence of a substance at the time. On cross-examination, Officer Gillespie testified about his conclusion that there was a party at Mitzel's residence where illegal drugs and marijuana were present.

[¶17.] Randle claimed Officer Gillespie's testimony countered Thomas's earlier statement to police that she was not smoking marijuana at Mitzel's home and did not observe others smoking marijuana. Randle argued that Thomas could now conform her testimony to be consistent with Officer Gillespie's testimony about drug use and diminish Randle's opportunity to impeach Thomas. Randle claimed this caused him prejudice because Thomas was expected to testify that Randle was handling the gun the entire evening and that Randle was told several times to put the gun away before it discharged.

[¶18.] The circuit court pointed out that Randle could impeach Thomas if her testimony differed from her earlier statement. The court also noted that the sequestration order was entered that morning, and it was unclear at the time Thomas entered the courtroom that she actually understood that the court had entered an order prohibiting her from entering the courtroom before she testified. The circuit court determined that Officer Gillespie was not a fact witness testifying about the events before the shooting. The court expected that Thomas's most crucial testimony would likely be about Randle's actions before the AK-47 discharged—a subject about which Officer Gillespie did not testify. The only remedy sought by Randle was a mistrial. The court denied the motion for a

mistrial, determining that Randle failed to show any prejudice from the violation of the sequestration order.

[¶19.] Thomas later testified that she had observed Randle, whom she had never met, "snorting" a substance at Mitzel's resident before the shooting. Thomas said she saw Randle "playing" with the AK-47 by aiming it at objects and taking the clip out and putting it back in again. Thomas claimed she had "begged [Randle] repeatedly" to put the gun away. Randle responded by telling her, "Let me handle this; I got this." Thomas testified she also "begged" Mitzel to remove the rifle from Randle and take it upstairs. Mitzel eventually complied and took the gun away from Randle. Thomas testified that Randle grabbed the gun again and continued to have it in his possession thereafter. Thomas left the party before the shooting occurred.

[¶20.] Thomas admitted she had smoked marijuana earlier on the evening of the incident but denied smoking it at Mitzel's house. She also claimed she was not impaired by the marijuana. After Thomas's testimony, the circuit court gave Randle further opportunity to address any concerns with Thomas's testimony. Randle's trial counsel did not assert any prejudice arising from the violation of the sequestration order following Thomas's testimony or ask to exclude her testimony.

[¶21.] The decision to grant or deny a mistrial or exclude testimony when the court's sequestration order is violated is within the sound discretion of the circuit court. *State v. Rough Surface*, 440 N.W.2d 746, 755 (S.D. 1989); *State v. Dixon*, 419 N.W.2d 699, 701 (S.D. 1988). "To find an abuse of discretion by the trial court in denying a mistrial where a sequestration order was violated, it must be shown

that the denial prejudiced the defendant's rights." *Dixon*, 419 N.W.2d at 701. "Prejudice is established where the witness'[s] testimony has changed or been influenced by what [they] heard from other witnesses." *Id.* (quoting *State v. Swillie*, 357 N.W.2d 212, 215 (Neb. 1984)).

[¶22.]      There is no showing that Thomas's testimony was tainted by what she heard in the courtroom.  Randle did not claim Thomas changed her testimony or suggest how it may have been influenced by listening to Officer Gillespie's testimony.  Further, several witnesses provided testimony after Thomas similar to Thomas's: that Randle was handling the AK-47 and did not listen to those who had asked him to put the rifle away before it discharged.  Randle has failed to show prejudice arising from the inadvertent violation of the sequestration order.  The circuit court did not abuse its discretion by denying Randle's motion for mistrial.

> 2.     *Whether the circuit court erred by denying Randle's motion for mistrial after the prosecutor asked a police officer whether Randle had invoked his right to counsel during an interview with the officer.*

[¶23.]      During the trial, the prosecutor questioned Detective Bakke about an interview with Randle that took place on the morning of October 25, 2016.  The colloquy between the prosecutor and Detective Bakke proceeded as follows:

> [Prosecutor]: So with Mr. Randle now as the focus of the investigation, does anybody attempt to speak with him?
>
> [Detective Bakke]: I spoke with him a couple times early on around 3:30 in the morning and talked with him in regards to finding who had done this and asking for his cooperation, and then I came back and talked with him around—oh, I believe it was 6:30, 7:00 in the morning, and I sat with him at that point.
>
> [Prosecutor]: Did he invoke his right to an attorney while you were speaking with him?

[Randle's Counsel]: Objection. May counsel approach?

[¶24.]    Detective Bakke never answered the question whether Randle had asked for an attorney. However, Randle asserts that the prosecutor's question improperly referenced Randle's exercise of his constitutional right to counsel and prejudiced him at trial. He cites *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S. Ct. 2240, 2245, 49 L. Ed. 2d 91 (1976), where the Supreme Court held it was "fundamentally unfair and a deprivation of due process to allow [an] arrested person's silence to be used to impeach an explanation subsequently offered at trial." Randle also points to other cases determining that evidence or argument concerning a defendant's exercise of a constitutional right is improper. In *United States v. Moreno*, 233 F.3d 937, 940 (7th Cir. 2000), the court stated that evidence of a defendant's exercise of his Fourth Amendment right against unlawful search and seizure, by denying law enforcement access to his home in the absence of a warrant, should not have been admitted at trial. Randle also points to *United States v. Thame*, 846 F.2d 200, 207 (3rd Cir. 1988), which held it was "error for [a] prosecutor to argue that [the defendant's] reliance on his fourth amendment rights constituted evidence of [the defendant's] guilt."

[¶25.]    Randle also argues that the question improperly inserted comment about his right to remain silent and to not testify. "It is the settled law of this state that it is reversible error for the prosecution to call to the attention of the jury the failure of [a] defendant to testify." *State v. Winckler*, 260 N.W.2d 356, 369 (S.D. 1977) (quoting *State v. Brown*, 132 N.W.2d 840, 842 (S.D. 1965)). This Court has specified that a prosecutor is forbidden from making "direct comments on the

defendant's failure to take the stand" or "indirect allusions designed to accomplish that end and which in fact could accomplish it." *Id.* "When the comments are indirect allusions, the test is whether a reasonable intelligent jury would understand them to point out defendant's failure to testify." *State v. Wright*, 1999 S.D. 50, ¶ 31, 593 N.W.2d 792, 804 (quoting *State v. Wilson*, 297 N.W.2d 477, 482 (S.D. 1980)); *see also Winckler*, 260 N.W.2d at 369 ("Where no direct allusion is made to the [failure to testify], but the error rests in an alleged intent to accomplish such purpose by indirection, each case must be considered upon its own particular facts.").

[¶26.] "Motions for mistrial are within the discretion of the trial judge." *State v. Kryger*, 2018 S.D. 13, ¶ 33, 907 N.W.2d 800, 812 (quoting *State v. Ball*, 2004 S.D. 9, ¶ 16, 675 N.W.2d 192, 197). Therefore, "denial of a motion for mistrial will not be overturned unless there is an abuse of discretion." *Ball*, 2004 S.D. 9, ¶ 16, 675 N.W.2d at 197. "Constitutional interpretation is a question of law reviewable de novo." *State v. Hi Ta Lar*, 2018 S.D. 18, ¶ 6, 908 N.W.2d 181, 183 (quoting *Kraft v. Meade Cty. ex rel. Bd. of Cty. Comm'rs*, 2006 S.D. 113, ¶ 2, 726 N.W.2d 237, 239). "We review the circuit court's factual findings for clear error but give no deference to the circuit court's conclusions of law." *Id.* (quoting *State v. Medicine*, 2015 S.D. 45, ¶ 5, 865 N.W.2d 492, 495).

[¶27.] The State's inquiry about whether Randle invoked his right to an attorney was not relevant or proper.[1] But the question was never answered, and

---

1. The record indicates that Randle's two, early morning interviews with Detective Bakke took place at the Sioux Falls Law Enforcement Center. But

(continued . . .)

there was no comment or evidence presented concerning whether Randle asked for an attorney or refused to answer questions.  The prejudice in cases cited by Randle arose not from the mere mention of the defendant exercising a constitutional right but from a prosecutor's assertion that the defendant's exercise of the right suggested guilt.  Further, the circuit court reviewed the prosecution's full strategy to see if there was a concerted effort to create a "theme of trying to establish a prejudice by improper means against the defendant."  The court concluded that "there isn't any theme here."  Finally, after denying the motion for mistrial, the court stated that it would remind the jury of the "instruction [it] previously gave that no question, no objection made by an attorney, or any statements or arguments, is evidence and is not to be considered as evidence.  Because that's all we have here is the question."

[¶28.]	The court properly reviewed the circumstances, found there were no improper direct statements or indirect allusions about Randle's decision to exercise his constitutional rights, and determined there was no prejudice to Randle.  The circuit court did not err in determining that the question alone did not implicate Randle's right to remain silent.  Further, Randle has failed to show any prejudice

---

(. . . continued)

> there was no other evidence presented regarding the circumstances surrounding the interrogation.  Although there was no determination whether Randle was in custody at the time he was questioned, we assume for the purpose of analyzing this issue that Randle *was* in custody and entitled to assert his Fifth Amendment right to counsel.  "The purpose of the Fifth Amendment right to counsel is to protect individuals from self-incrimination and assist in the custodial interrogation process." *State v. Wright*, 2009 S.D. 51, ¶ 27, 768 N.W.2d 512, 522 (quoting *State v. Hoadley*, 2002 S.D. 109, ¶ 26, 651 N.W.2d 249, 256).

that arose from the State's single unanswered question. The circuit court did not abuse its discretion in denying Randle's motion for mistrial.

> 3. *Whether the circuit court erred by rejecting Randle's proposed jury instruction on excusable homicide.*

[¶29.] To support his theory that Ashame's shooting was an accident, Randle proposed the following instruction: "A homicide is excusable if committed by accident and misfortune in doing a lawful act, with usual and ordinary caution." The language of the proposed instruction is identical to the excusable homicide statute in SDCL 22-16-30. Randle submitted the proposed instruction after the State concluded its case-in-chief but before the defense rested and before any rebuttal from the State. There was no pretrial order establishing a deadline for submitting proposed instructions.

[¶30.] The State objected to the instruction. It argued that Randle was not acting lawfully at the time the AK-47 discharged because he was in possession of and had ingested codeine, cocaine, and THC. It also argued that because Randle had previously been convicted of a felony and was under bond conditions, he was prevented from possessing a weapon at the time of the shooting. The State also asserted that Randle was not handling the AK-47 with "usual and ordinary" caution at the time it discharged.

[¶31.] The circuit court denied Randle's proposed instruction, noting that it was submitted after the State had rested and that the State would either need to reopen the case or present additional evidence on rebuttal to respond to the defense. The circuit court also determined that Randle's conduct was unlawful, relying on the State's representation that Randle was previously convicted of a felony. The

-12-

record does not show that Randle was a felon at the time of the shooting, but Randle was under bond conditions prohibiting him from possessing weapons.[2] The circuit court also determined that Randle was not acting lawfully at the time the weapon discharged because Randle had ingested controlled substances and marijuana. The circuit court acknowledged that it may have been a fact question whether Randle was under the influence of drugs or alcohol at the time the weapon discharged. In denying the instruction, the court relied in part on *State v. Andrews*, 2001 S.D. 31, ¶ 11, 623 N.W.2d 78, 81, asserting that *Andrews* stands for the proposition "that various conduct of the accused would take [Randle] outside of a lawful act" for the purposes of an excusable homicide instruction.[3]

---

2.    The two felony convictions listed in the part II information, referenced at the time of settling instructions, were pending charges against Randle at the time of the shooting. Randle was subject to bond conditions in both files that prohibited him from possessing a weapon. Randle pleaded guilty and was sentenced on both felonies after the shooting but before trial.

3.    The circuit court's reliance on *Andrews* was misplaced. In *Andrews,* the defendant was charged with manslaughter, and the circuit court gave an excusable homicide instruction under SDCL 22-16-30 as requested by the defendant. No issue was raised on appeal concerning the excusable homicide instruction given by the court. Instead, the Court considered whether the circuit court erred by permitting the State to present other act evidence showing the defendant was a minor in possession of alcohol, driving under the influence of alcohol, in possession of a stolen weapon, and in possession of a weapon while under the influence at the time of the shooting. The Court held that this evidence was properly admitted to show defendant was not acting lawfully at the time of the shooting, stating, "[Defendant's] underage and driving under the influence through the streets of Rapid City with the barrel of a loaded shotgun pointing out the driver's side window, was not 'doing any lawful act' when the gun discharged killing Davis." 2001 S.D. 31, ¶ 11, 623 N.W.2d at 81. The language in *Andrews* is not an affirmation that the lawfulness of the defendant's actions should be determined by the court as a matter of law but that evidence of unlawful conduct may be admissible on the defendant's claim of excusable homicide.

[¶32.]     Our standard of review of a circuit court's denial of a proposed jury instruction is well settled. *State v. Shaw*, 2005 S.D. 105, ¶ 18, 705 N.W.2d 620, 625.

> We review a trial court's refusal of a proposed instruction under an abuse of discretion standard. The trial court has broad discretion in instructing the jury. Jury instructions are satisfactory when, considered as a whole, they properly state the applicable law and inform the jury. Error in declining to apply a proposed instruction is reversible only if it is prejudicial, and the defendant has the burden of proving any prejudice.

*Id.* (quoting *State v. Martin*, 2004 S.D. 82, ¶ 21, 683 N.W.2d 399, 406). "An erroneous instruction is prejudicial if in all probability it produced some effect upon the verdict and is harmful to the substantial rights of the party assigning it." *Id.* ¶ 18, 705 N.W.2d at 625-26 (quoting *First Premier Bank v. Kolcraft Enterprises, Inc.*, 2004 S.D. 92, ¶ 40, 686 N.W.2d 430, 448). In the context of a requested instruction on self-defense, we have stated that "[d]enial of a defendant's request for an instruction on self-defense where such a request is properly submitted and supported by the evidence is reversible error because it infringes on a defendant's constitutional right to due process." *State v. Bruder*, 2004 S.D. 12, ¶ 8, 676 N.W.2d 112, 115.

[¶33.]     "Upon proper request, defendants are entitled to instructions on their defense theories if evidence supports them." *State v. Birdshead*, 2015 S.D. 77, ¶ 27, 871 N.W.2d 62, 73 (quoting *State v. Pellegrino*, 1998 S.D. 39, ¶ 9, 577 N.W.2d 590, 594). A circuit court "need not instruct on . . . excusable homicide . . . if the evidence does not support an instruction thereon." *State v. Woods*, 374 N.W.2d 92, 97 (S.D. 1985). Conversely, "[w]hen a defendant's theory is supported by law and has some foundation in evidence, *however tenuous*, the defendant has a right to present it."

-14-

*Birdshead,* 2015 S.D. 77, ¶ 27, 871 N.W.2d at 73 (quoting *State v. Roach,* 2012 S.D. 91, ¶ 13, 825 N.W.2d 258, 263) (emphasis added).

[¶34.] Randle argues the excusable homicide instruction was a correct statement of the law and that there was evidence supporting his theory of defense. The State counters that the circuit court correctly determined that Randle was not acting lawfully at the time of the shooting. The State also argues that Randle's proposed excusable homicide instruction was incomplete and not available under the facts of this case because the pattern jury instructions and SDCL 22-16-31 provide that an excusable homicide instruction is not available if the killing was caused by a dangerous weapon, as was the case here.

[¶35.] Contrary to the State's claim, SDCL 22-16-30 and SDCL 22-16-31 set forth separate and distinct excusable homicide defenses. The defense set forth in SDCL 22-16-30, relied upon by Randle, may be available when there are facts showing the homicide was committed accidentally, while doing a lawful act, and with usual and ordinary caution. The defense in SDCL 22-16-31 is premised upon evidence showing the homicide was accidental and was committed "in the heat of passion, upon sudden and sufficient provocation, or upon a sudden combat." However, SDCL 22-16-31 provides that the "heat of passion" defense is not available when a dangerous weapon is used. In contrast, the use of a dangerous weapon does not necessarily preclude the excusable homicide defense under SDCL 22-16-30. Randle's sole defense and requested instruction was the excusable homicide defense under SDCL 22-16-30.

[¶36.]     There was evidence of unlawful conduct by Randle and evidence that he was not acting with usual and ordinary caution at the time of the shooting. However, the State acknowledged that the shooting was not intentional.  The State also presented Randle's version of the shooting in its case-in-chief through the recorded phone call to his girlfriend.  Randle claimed that the weapon somehow discharged as he was trying to catch the rifle from falling after Mitzel placed it on his lap.  In evaluating Randle's defense, the jury could have also considered Randle's actions immediately after the shooting and questioned the accuracy of the eye-witness testimony.  Randle and Henderson stayed on the scene and rendered aid to Ashame, while other partygoers, many of whom were eye-witnesses at trial, fled the scene, taking and disposing of incriminating evidence.  Randle also instructed Henderson to place the 911 call and to open the door when law enforcement arrived.  The eye-witnesses were also cross-examined about conflicting statements, their difficulty remembering some of the details of the evening, and their use of alcohol or other illegal drugs prior to the shooting.

[¶37.]     Together, this evidence presented a theory for the jury's consideration whether the homicide was accidental and excusable under SDCL 22-16-30.  South Dakota's excusable homicide statute provides that "[h]omicide is excusable if *committed* by accident and misfortune *in* doing any lawful act, with usual and ordinary caution."  *Id.* (emphasis added).  Absent the proposed excusable homicide instruction, the jury was unable to consider all the testimony bearing on Randle's actions *at the time of shooting*.  The denial of the proposed instruction effectively determined, as a matter of law, that Randle's illegal conduct and evidence that he

was not handling the gun with usual and ordinary caution was the *cause* of Ashame's death. Requiring a causal connection between the acts and the homicide is consistent with the view taken by jurisdictions with similar excusable homicide statutes.[4]

[¶38.] The circuit court's failure to give the excusable homicide instruction prejudiced Randle. Throughout its closing argument, the State argued that the shooting was unintentional, but the State also argued that there was no dispute that the elements of first-degree manslaughter had been established under the circuit court's instructions.[5] Randle did not challenge the medical examiner's testimony and other evidence showing that Ashame's death was caused by a bullet

---

4. *See Commonwealth v. Legg*, 711 A.2d 430, 432 n.2 (Pa. 1998) (quoting *Commonwealth v. Hobson*, 398 A.2d 1364, 1368 (Pa. 1979)) (stating that one of the elements of the defense of excusable homicide is that "[t]he act resulting in death must be a lawful one"); *Ealey v. State*, 158 So. 3d 283, 289 (Miss. 2015) (quoting *Burge v. State*, 472 So. 2d 392, 395 (Miss.1985)) (noting that excusable homicide occurs when a jury finds that a killing occurred while a defendant was doing "a lawful act by lawful means with usual and ordinary caution and without any unlawful intent"); *State v. Yarborough*, 679 S.E.2d 397, 407 (N.C. Ct. App. 2009) (quoting *State v. York*, 489 S.E.2d 380, 390 (N.C. 1997)) ("Any defense based on the suggestion that the death was the result of an accident or misadventure must be predicated upon the absence of an unlawful purpose on the part of the defendant."); *State v. Burriss*, 513 S.E.2d 104, 107 (S.C. 1999) ("the burden rests upon the State to prove beyond a reasonable doubt that the unlawful act in which the accused was engaged was at least the proximate cause of the homicide"); *see also* 40 Am. Jur. 2d *Homicide* § 75 (1968) ("The fact that one carries a concealed weapon in violation of the law does not render him criminally responsible . . . where death is caused by the accidental discharge of the weapon, for in such case death cannot be said to be the natural or necessary result of carrying the weapon in violation of law.").

5. The circuit court instructed the jury that first-degree manslaughter required the State to prove that: (1) defendant caused Ashame's death; (2) the killing was by a means of a dangerous weapon; and (3) the defendant did so without any design to effect Ashame's death.

-17-

wound from the AK-47. Further, Randle admitted, consistent with other evidence, that he caused the AK-47 to discharge. Even if the jury believed Randle's statement or disbelieved some or all of the eye-witness testimony, the elements of first-degree manslaughter were established under the circuit court's instructions.

[¶39.] Because we determine that the circuit court only erred instructing on first-degree manslaughter, we need not address Randle's fourth claim regarding any cumulative effect of the circuit court's alleged errors.

## Conclusion

[¶40.] We affirm Randle's convictions for ingestion of a controlled substance and possession of marijuana. We reverse and remand the first-degree manslaughter conviction for a new trial.

[¶41.] GILBERTSON, Chief Justice, ZINTER and KERN, Justices, and SEVERSON, Retired Justice, concur.

[¶42.] SALTER, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.